## CONTINENTAL & COMMERCIAL TRUST & SAVINGS BANK v. ALLIS-CHALMERS CO. et al.

(District Court, E. D. Wisconsin. October 30, 1912.)

1. CORPORATIONS (§ 482*)—INTERVENTION—FORECLOSURE SUIT BY MORTGAGE TRUSTEE.

To warrant a court in disregarding the rule which precludes the intervention of an individual bondholder in foreclosure by the mortgage trustee as representative of all bondholders, the petition for intervention must allege traversable facts which, if true, show that the trustee occupies a hostile position or other reason why he cannot fairly represent petitioner, and general allegations that the suit is fraudulent and collusive, and that the trustee is co-operating with certain bondholders in a reorganization scheme, are insufficient.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1870, 1877–1888; Dec. Dig. § 482.*]

2. CORPORATIONS (§ 482*)—INTERVENTION—FORECLOSURE SUIT BY MORTGAGE TRUSTEE.

Where there was admittedly default by a corporation in interest on bonds secured by a trust mortgage, and the requisite proportion of the bondholders demanded foreclosure, the fact that such bondholders were

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

in a combination with the officers to reorganize the corporation, and that both the default and foreclosure were means to that end, do not affect the right and duty of the mortgage trustee to foreclose, and its compliance with the demand does not indicate partiality which will entitle nonassenting minority bondholders to intervene in the suit.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1870, 1877–1888; Dec. Dig. § 482.*]

3. CORPORATIONS (§ 482*)—INTERVENTION—FORECLOSURE SUIT BY MORTGAGE TRUSTEE.

Where the trustee in a corporation mortgage is not disqualified from acting in the foreclosure of the mortgage, the fact that a majority of the bondholders have combined to reorganize the corporation, which is opposed by other bondholders, does not entitle the latter to intervene in the foreclosure suit unless and until it is sought to bring such controversy into the suit, and a situation arises in which the trustee does not, or cannot, fairly represent all bondholders and protect their rights under the mortgage.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1870, 1877–1888; Dec. Dig. § 482.*]

4. CORPORATIONS (§ 482*)—INTERVENTION—FORECLOSURE SUIT BY MORTGAGE TRUSTEE.

A bill for foreclosure by the trustee in a corporation mortgage, otherwise sufficient, need not be framed to meet possible contingent situations, as the necessity of enforcing stockholders' liability or the recovery of dividends illegally paid in case of a deficiency judgment, which may be dealt with if they arise by supplemental pleadings, and the fact that the bill does not anticipate such situations affords no ground for intervention by bondholders prior to decree and sale.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1870, 1877–1888; Dec. Dig. § 482.*]

5. CORPORATIONS (§ 482*)—INTERVENTION—FORECLOSURE SUIT BY MORTGAGE TRUSTEE.

The failure of a trustee in a corporation mortgage, who had instituted a foreclosure suit, to answer a series of 18 questions, asked by a bondholder, within two days after their receipt, and where most of the questions were such as it could not be required to answer at that stage of the case, cannot be construed as a hostile act toward the bondholders, and is not ground for the filing of a petition of intervention by the one propounding the questions.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1870, 1877–1888; Dec. Dig. § 482.*]

6. CORPORATIONS (§ 506*)—SUIT AGAINST—INTERVENTION BY STOCKHOLDER.

To entitle a stockholder to intervene in a suit against the corporation, he must make a showing identical with that which would enable him to maintain an independent suit as a stockholder to assert or protect a corporate right.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1958–1970; Dec. Dig. § 506.*]

7. CORPORATIONS (§ 211*)—STOCKHOLDER'S SUIT—PLEADING CONDITIONS PRECEDENT.

While the rule that, to entitle a stockholder to maintain a suit founded upon rights which may be properly asserted by the corporation, he must set forth particularly his efforts to obtain action by the officers and directors of the corporation, does not apply where it appears that such efforts would have been useless, to bring the case within such exceptions, the facts must be alleged with the particularity required by

the rule itself, and general charges of fraud and collusion on the part of the officers and directors are insufficient.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 814–825; Dec. Dig. § 211.*

Rights of stockholders to sue or defend on behalf of corporation as dependent on refusal of corporation or officers to act, see note to Eagle Iron Co. v. Colyar, 87 C. C. A. 390.]

8. CORPORATIONS (§ 482*)—SUIT AGAINST—INTERVENTION BY STOCKHOLDER.

To entitle a stockholder to intervene and defend a suit against the corporation to foreclose a mortgage on its property, where there was an admitted default in interest, which, under the mortgage, authorized foreclosure, the stockholder must allege facts clearly showing the necessity of the intervention to protect rights of the corporation, and general allegations in his petition of fraud and collusion between "certain persons," including officers of the corporation, and that the corporation had funds applicable thereto sufficient to have paid the interest on the mortgage debt and prevented the default, are insufficient, both because they do not show any fraudulent act on the part of the officers and directors of the corporation and because they state no defense to complainant's suit.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1870, 1877–1888; Dec. Dig. § 482.*]

In Equity. Suit by the Continental & Commercial Trust & Savings Bank against the Allis-Chalmers Company and others. On demurrers to petitions for leave to intervene by Nathan Eiseman and Timlin & Gold. Demurrers sustained.

The suit is brought to foreclose a trust deed given under date of July 2, 1906, by the defendant Allis-Chalmers Company, a New Jersey corporation, to the complainant, as trustee, upon property at Milwaukee and elsewhere, to secure an issue of bonds, of which, at the date of filing the bill, $11,148,000 in par value were outstanding; default in the payment of interest on which is alleged to have occurred January 1, 1912, resulting further in the maturity of the principal pursuant to the tenor of such bonds and trust deed.

The bill, to which a copy of the trust deed is annexed, contains the ordinary averments necessary for foreclosure of the trust deed, a detailed recital whereof is unnecessary to a consideration of the questions now presented.

Prior to the filing of the bill, a bill, hereinafter referred to as the "Administration" suit, was filed in this court by creditors and bondholders of the Allis-Chalmers Company, the defendant, wherein the herein defendants, D. W. Call and Otto H. Falk, were appointed receivers, pursuant to which appointment they came into possession and assumed control and conduct of its property and business. In this suit Fraser & Chalmers, Limited, an English corporation, presented its petition asking leave to intervene; its representations being, briefly, that it held stock in the defendant company, that the bonds to secure which the herein mortgage was given were void, that the administration suit was collusive, and praying that it may defend, asking among other things that the receivers be required to pay the interest on such bonds, should they be held valid, the claim being that the defendant company has funds available for that purpose. Such proceedings for intervention are pending upon a rule to show cause; the parties interested having asked leave to present proofs in support of and in opposition thereto. One Eiseman also presented a petition of similar import in the administration suit, and after the institution of the present, or foreclosure suit, presented it herein. He, however, alleged the ownership of both stock and bonds. Then the petitioners Timlin & Gold, bondholders, filed their petition herein, asking, as bondholders, leave to intervene.

The complainant demurred to both the Eiseman and the Timlin & Gold pe-

titions, and the case is before the court on these demurrers. The sufficiency of the petitions being thus assailed, an examination of their allegations becomes necessary.

First, as to the Eiseman petition:

(1) That petitioner owns 800 shares of stock of the par value of $100, and 50 first mortgage bonds of the par value of $100, and 50 first mortgage bonds of the par value of $1,000 each, of the defendant company. That the "foreclosure proceedings are fraudulent and collusive and were instituted at the request of and in behalf of certain persons who desire to reorganize the company for their own profit, and to deprive bondholders and stockholders of their just dues." That defendant's officers, particularly its president, are parties to "this fraudulent and collusive scheme and have agreed that the foreclosure proceedings should not be opposed by them," and, though funds are in their hands, they have not endeavored to cure the alleged interest default on the bonds.

(2) That foreclosure is unnecessary, the company having funds applicable to the payment of the bond interest due, and would have avoided the default. The president of the company is alleged to have stated under oath that on December 31, 1911, and on March 22, 1912, there was cash on hand upwards of $900,000. That such is the fact. That at the date of such petition, June 7, 1912, there "are still on hand * * * sufficient funds to pay said interest on said bonds and to cure the alleged default."

(3) That the foreclosure "would be highly prejudicial to the rights" of petitioner, both as a bond and stock holder. That if sold at foreclosure the mortgaged properties would realize but a small proportion of their actual value and would be sacrificed. That probably not enough would be realized to pay the bonds in full. That the value of the mortgaged properties depends largely on their continued use for the purposes for which they were designed, and they might have to be sold separately, not as a unit, in which event they would deteriorate, etc. That this would prejudice petitioner as a bondholder, and will to a greater extent prejudice him as a stockholder.

(4) That the foreclosure is fraudulent and collusive as stated, and is part of a fraudulent scheme to force the adoption of a plan of reorganization designed to enable certain persons to gain control of the property. In December, 1911, certain of the officers and directors of defendant formed a reorganization committee, and are endeavoring, "through this committee and through the officers of said company and its receivers," to control the management and ownership of said property irrespective of the rights of the bondholders and stockholders not associated with them. That the reorganization committee, in conjunction with an underwriting syndicate managed by one Wallace and one Hemphill, both members of said committee, have "fraudulently schemed and colluded" for the payment of a large commission in money and stock, for their underwriting services, which amount to be paid is "altogether disproportionate to their value," etc. That certain stockholders have not assented to the plan of reorganization, and the foreclosure proceedings are resorted to to force assent by petitioners and others similarly situated. And the foreclosure is averred to have been instigated and requested by the reorganization committee to compel assent to and the payment by shareholders of the assessment required by the reorganization plan. That the officers and receivers intend to default in the foreclosure proceeding.

(5) That, as a further part of the scheme to force petitioners to assent to the reorganization, the administration suit was instituted; and that the bill therein was filed, not for the purpose therein averred, but with the "connivance, consent, and collusion of certain officers and persons in control of said company" to acquire control of its property, to force assent to the reorganization, etc. That the officers of said company consented by answer, to the appointment of receivers. That Call, one of the receivers, who was president of the company, since his appointment has continued to participate in the further reorganization plans as alleged. "That both receivers are co-operating and colluding to cause its adoption."

(6) The prayer is for leave to intervene and to be made a party defendant,

that the receivers be directed to pay the overdue coupons and cure the default alleged in the foreclosure bill, and that foreclosure be "stayed and the present bill dismissed."

Secondly, as to the petition of Timlin & Gold:

(1) That petitioners own 14 bonds of $1,000 each, secured by the trust deed described in the bill.

(2) That a combination exists between certain bondholders, some of whom are also creditors and some shareholders of the defendant. The object of the combination is to compel all bondholders to come into the combination and exchange their bonds for stock, as set forth in certain notices published by said combination, printed copies of which are annexed to the petition. Petitioners do not desire to enter this combination, but are willing to have their bonds paid at par, and the assets of the defendant company are averred to be ample therefor.

(3) Petitioners aver "on information and belief that the trustee, complainant, is not and will not be impartial as between the said combination of bondholders and your petitioners, either in the marshaling of liens or in the resistance of exorbitant compensation of attorneys and receivers and trustee, or in the application for final decree, or in the form or shape of final decree of foreclosure to be entered herein, so that said decree will prevent any bondholder getting any advantage over any other bondholder according to the covenants of said mortgage."

(4) That default upon interest coupons maturing on January 1, 1912, was made. Thereupon and before the foreclosure was instituted, the administration suit (above mentioned) was instituted, two receivers appointed, one of them a director and stockholder of defendant, the other "related to the complainants or interested with them, and also a partner of a director in the defendant corporation."

(5) The unsecured creditors procuring the appointment of the receivers "were interested in said reorganization scheme either as members thereof, or as representing the corporation's creditors whose officers and shareholders were members of said reorganization scheme."

(6) Petitioners are informed by the Eiseman petition (above referred to), "and upon such information also verily believe, that the trustee complainant is not impartial as regards the beneficiaries, the holders of said mortgage bonds, but is acting with, and in the interest of, said combination for reorganization."

(7) The stock and bonds authorized and issued are described. Of such stock, $19,000,000 preferred and $16,000,000 common, outstanding, "was not issued for money, property, or labor equal to the par value of such stock," or considered in good faith to be so equal "by the issuing or receiving parties." The shares of stock were issued upon a "fraudulent overvaluation of property taken in payment thereof." This was notorious and common knowledge, known to the complainant when the foreclosure bill was filed. The bill contains no prayer for judgment for deficiency and no attempt to reach the liability of such stockholders of the defendant corporation. The mortgage purports to release stockholders' liability; "but such stockholders (doubtless meaning those last referred to), by fraud and by failure to observe covenants of the mortgage on their part, have forfeited such exemption."

(8) Notwithstanding that the capital stock was not paid for in full, and the liability of stockholders and officers ensuing therefrom, dividends were paid from July 25, 1901, to February 1, 1904, and the foreclosure bill "makes no attempt to recover" the same "and neglects to lay the foundation for such recovery."

(9) The bill is further criticised because "the good will of the defendant corporation is not included or required to be sold"; that the prayer for relief is "so contradictory and inconsistent that petitioners cannot tell what form of decree will be finally adopted." The prayer is for strict foreclosure and also foreclosure and sale; that petitioners cannot ascertain from the bill what claim the complainant makes respecting bonds annually surrendered under article 3 of the mortgage; that no prayer is made for the re-

covery of moneys from the defendant receivers "diverted by them from the payment of interest on such bonds."

(10) The receivers are alleged to be not "impartial or disinterested," but "allied with said reorganization scheme." That the attorneys representing the defendant, the receivers, and the reorganization combination, respectively, have not been selected as adversary or contesting advocates, but by mutual agreement, to further the reorganization plan. That under the covenants of the mortgage no such combination as is carried on for foreclosure can properly be made.

(11) Bondholders having 80 per cent. of the outstanding bonds have assented to the reorganization plan, by reason whereof, "and the relations of the several attorneys and their mode of selection, and by reason of the relationship of the trustee to such attorneys and to the existing receivership and such combination for reorganization," the interests of petitioners cannot be properly protected, etc.

(12) Petitioners desire to present evidence to persuade an appraisal of the mortgaged property; to require a fixed price of sale sufficient to pay petitioners' demands; that, in case the bondholders bid at the sale and may pay the amount bid or the major part thereof by surrendering mortgage bonds, they may retain the same proportional interest in the mortgaged property as such bidding bondholder now holds.

(13) The petitioners aver that on June 24, 1912, they addressed to the complainant a communication containing 18 questions, which, on the day of the verification and filing of their petition, June 27, 1912, it is averred, complainant had not answered. Such questions may be summarized as follows: Whether the complainant, trustee, is aware of the existence of the reorganization committee which contemplates compelling bondholders to exchange their holdings for stock. If not, whether the trustee will inquire into its existence and operation. Whether the bonds which requested the trustee to foreclose comprise those held by members of the reorganization committee. Whether the trustee is "consciously operating with the combination in any way." The amount of the defendant's cash and cash assets on January 1, 1912, and why interest payment was defaulted. Whether the complainant will amend its bill so as to seek recovery from the receivers of "all such moneys covered by the lien of the mortgage which they have diverted to other purposes." Whether the receivership did not have the effect of diverting from bond creditors who in the mortgage have released shareholders' liability, and of turning over to unsecured creditors, not so releasing, large sums of money. The cash and cash assets of the defendant when foreclosure proceeding started, and, if the trustee does not know, then "what steps have been or will be taken to ascertain this? Has the trustee collected, or will it take steps to collect, the dividends on stock in other companies, held by the defendant," and has it proceeded "with reference to the voting power" as provided in a certain article of the mortgage, and, if not, does it intend to take speedy action in this behalf? Does the Bullock Manufacturing Company pay dividends, "and what are the dividend days?" What steps, if any, does the trustee intend to take, toward appraisal of the property, and fixing a minimum price of sale, to reduce expenses and to prevent the combination of bondholders from taking advantage of nonassenting bondholders? Whether the trustee intends "to contest or consent to the legality of the receivership * * * and their (receivers') fees and expenses, and whether the trustee knows that the receivers" are co-operating "with the reorganization committee." What steps, if any, are taken or contemplated for the recovery of dividends paid before the stock was really paid in full, and whether complainants will "make any such claim" in its bill. Whether the properties mortgaged "are now operating at a profit or at a loss." Does complainant "claim that the mortgage covers good will and operating profit, or that it does not"? Will complainant send petitioners a copy of the bill?

The demurrers assign, generally, insufficiency of the petitions in substantive allegations for intervention, and also, specifically, the failure to present or tender a pleading such as would be sought to be interposed, should intervention be allowed.

Mayer, Meyer, Austrian & Platt, of Chicago, Ill., for complainant.
Henry W. Taft, of New York City, for defendant Allis-Chalmers Co.
Max W. Babb, of Milwaukee, Wis., for receiver.
Walter L. Gold, of Milwaukee, Wis., for Timlin & Gold, interven-
ing petitioners.
E. P. Carver, of Boston, Mass., and L. B. Lamfrom and J. G. Flan-
ders, both of Milwaukee, Wis., for Nathan Eiseman, intervening pe-
titioner.

GEIGER, District Judge (after stating the facts as above). The
foregoing statement is believed to embody the contents of the petitions
filed, and to disclose the facts upon which the right to intervene is
based, excepting possibly certain allegations contained in affidavits or
portions of the files in the so-called administration proceeding, and
excepting possibly certain inferences claimed properly to be drawn
from such other proceedings or pleadings therein. It is apparent, at
the outset, that the proposed interveners present situations not in har-
mony with one another. The assertion by one that the preferred stock
held by the other is void can hardly be assented to by the latter as a
fact upon the applications to intervene. And, as to the proposed inter-
vener who holds both stock and bonds, an equal difficulty is found in
reconciling the interests arising out of one, with those arising out of
the other, capacity. The conclusion which I have reached renders un-
necessary a consideration of these apparently hostile situations.

The petitions will therefore be considered, first, from the standpoint
of bondholders; secondly, stockholders.

[1] The relations of bondholders to trustees under a deed or mort-
gage are governed by certain elementary principles which must serve
as a guide in determining the question presented. No question can be
raised but that a bondholder has an interest in the subject-matter of a
foreclosure suit, and, except for the rule about to be cited, would be a
requisite party.

"It is a cardinal principal in the administration of the law," said this
court, in Farmers' Loan & Trust Company v. Northern Pacific R. R. Co. [C.
C.] 66 Fed. 169, "that no man shall be condemned without a hearing. There-
fore it is that no one shall be concluded by a judgment to which he is nei-
ther party nor privy. Therefore it is that, as a general rule, all persons in-
terested in a controversy must be made parties thereto that their rights may
be determined and concluded by the judgment. There has grown into the
practice an exception, in some states recognized by positive enactment, that
the trustee of an express trust may maintain suit without joining his cestui
que trust. This is to avoid the expense and delay attending the getting to-
gether and joining of numerous parties whose interests have been committed
to the keeping of a trustee, and could be protected by him without their in-
tervention. Under the exception it has been well held that, in general,
courts can deal with bondholders only through their trustee, and that it is
not to be tolerated that each individual bondholder could at his own sugges-
tion assert his rights when they can be as well asserted through a trustee."

But, continues the court (66 Fed. page 174):

"The rule, however, creates an exception to the general principle that all
interested should join in the controversy. It is a rule of convenience to fa-
cilitate the conduct of the suit. It proceeds upon the assumption that the

cestui que trust can be fully and fairly represented and protected in his rights by the trustee or representative. A rule of convenience must, however, give way when rights are involved. If it appears that the trustee refuses or neglects to act, or stands in a hostile position, or has assumed a position prejudicial to the interests of the cestui que trust, the rule of convenience is put aside, and the cestui que trust must be admitted to represent his rights. because in such case the trustee has not (represented) and cannot fully and faithfully represent them"—per Jenkins, Circuit Judge.

The question is then presented: Do the petitioning bondholders disclose a situation demanding that the rule of convenience be "put aside," admitting them to represent their rights? Disregarding (for the present) complainant's contention that the petitions for intervention are insufficient because not accompanied by answer or other pleading embodying the cause of action or defense to be asserted, this must be undeniably true: That the petitions must disclose facts bringing them within the principles governing the right to intervene; and, in determining whether such facts are disclosed, the allegations of the petitions must be subjected to, and must meet, the same tests as are applied to ordinary pleadings to determine whether a cause of action or a defense is stated. In the Eiseman petition no fact is averred or alluded to calling in question or in any degree impugning the qualifications or conduct of the complainant trustee in discharging its functions under the deed of trust or in the suit. True, the foreclosure is characterized as "fraudulent," "collusive," and "unnecessary"; but the pleader doubtless intended these, not as averments of traversable facts, but rather as his conclusions or inferences to be drawn from the subsequent allegations respecting the institution of the administration suit and the formation of a reorganization committee, which latter is alleged to have instigated the foreclosure. The Timlin & Gold petition, however, approaches an attack directly upon the complainant trustee through an allegation, upon information and belief, that such trustee "is not and will not be impartial as between said combination of bondholders and your petitioners, either in the marshaling of liens or in the resistance of exorbitant compensations of attorneys, receivers, and trustee, or in the application for or shaping of final decree," etc.; and further "that they are informed" by the Eiseman petition, and "upon such information also verily believe that the trustee complainant is not impartial as regards its beneficiaries, the holders of said bonds, but is acting with, and in the interest of said combination for reorganization." But these fall very far short of disclosing facts showing partiality or hostility. It is not too much to say that a petition for intervention based upon hostility or partiality of the trustee should approach the same degree of definiteness and certainty ordinarily required in a bill of complaint seeking to remove a trustee, or to correct his administration of the trust—and it could not seriously be claimed that a bill alleging "partiality," "hostility," "neglect," or the like, howsoever often therein repeated, would meet the elementary requirement of alleging traversable facts. If the petitions showed a step taken by, or any circumstance affecting, the trustee, inconsistent with the discharge of its functions under the deed of trust requiring equal treatment of all

bondholders, its position would be challenged so as to require an answer.

The case of Farmers' Loan & Trust Company v. Northern Pacific R. R. Co., supra, affords a striking illustration. There, the trustee represented different sets of bondholders, secured by different trust instruments, under which conflicting claims of 'priority arose and were asserted. Charged as it was, under each instrument, with the performance of certain obligations, the conflict embarrassed it in, and probably disqualified it from, discharging them. Hence the rule of convenience was put aside, and the individual bondholders were admitted so that they could assert their claims unhampered by the relation of the trustee to the other bondholders.

Coming now to the allegations of these two petitions respecting the alleged combination of bondholders into a reorganization committee, and the alleged fraudulent scheme to obtain control of the defendant's property, these must be considered in the light of the conceded facts: First, the validity of the debt evidenced by the bonds and coupons; secondly, default in the payment of interest and the consequent maturity of the principal. Giving to both petitions the most favorable construction, their combined allegations are in substance that, though the defendant possessed a large amount of cash and cash assets, certain of its officers, confederating with certain bondholders, permitted default in the payment of interest, caused the administration proceeding to be instituted, all concurrently with the formation of the reorganization committee; the foreclosure proceedings following as a necessary result. It appears that a very large majority of the bondholders concur in the accomplishment of the reorganization. While the petitions charge this all as a fraudulent scheme, not a single fact or circumstance is alleged showing participation by the trustee in the alleged combination.

[2] True, it is claimed that the bondholders in the combination requested the foreclosure, and there is the general allegation that complainant is "co-operating" with the combination. But assuming that the trustee was so requested and complied therewith by instituting the proceedings, it was, after all, merely asserting a right granted and a duty imposed by the trust deed. The circumstance, admitting it to be true, that certain bondholders in association with officers permitted the default to occur—even admitting that they were actuated by an ulterior motive, or purpose, did not endow the trustee with any discretion to do otherwise than to obey the instrument under which it was empowered to act. So far as it was concerned, even admitting that it knew of the circumstances noted, the validity of the debt and the fact of default out of which its duty arose are not in the slightest degree called in question, and the motives which may have actuated the defendant's officers in suffering the default do not disqualify the trustee, nor impair its right as sole complainant to institute and prosecute the suit to foreclose. Dickerman v. Northern Trust Co., 176 U. S. 181, 20 Sup. Ct. 311, 44 L. Ed. 423.

[3] But it is urged that if there is not a sufficient showing of partiality, adverse interest, or the like, on the part of the trustee, a dis-

tinct ground for intervention is presented because of the controversy which is said to exist between the bondholders upon the matter of assenting to the reorganization plan. It is said that, so long as the trustee is impartial and has no adverse interest, it represents all bondholders as to all matters pertaining to the foreclosure and collection under the terms of the trust instrument, but not for the purpose of determining conflicts between different sets of bondholders. Attention is called to the provision of the mortgage forbidding a preference of any kind to one bondholder over another, and requiring proceedings to be maintained for the equal and common benefit of all holders of bonds and coupons. Then, because certain bondholders have combined as a reorganization committee, and, as the plan discloses, probably expect to purchase at foreclosure sale, and transfer the property to a new corporation, and the petitioners are unwilling to join this combination, they urge that there is a controversy among bondholders which of itself gives them the right to intervene in this suit. This situation is fully covered by the rule of convenience above referred to. So long as the trustee is not disqualified by reason of a hostile or prejudicial act, or because of conflicting interests vested in, or duties charged upon it, it has and can have no interest in any collateral controversy between bondholders. Until its participation in such controversy is shown, or unless and until it is sought to bring it into the foreclosure proceedings and thereby to influence a different course than would ordinarily be pursued, such controversy is of no concern either of the trustee or of the court entertaining the foreclosure.

As indicated, a mere allegation that the trustee is "co-operating" with a reorganization committee is not, in the absence of a specification of acts of participation, or of a personal interest in the plan, at variance with its interest as trustee, a sufficient showing to let in nonconcurring bondholders. When the final decree is to be entered, the duty devolves upon the court and the trustee to see to it that, as to form and substance, it will embody and carry out explicitly the provisions of the trust instrument respecting the ratable participation of all bondholders in the proceeds of sale; and, if it is proposed to embody in such decree provisions which will give recognition to any class of bondholders with respect to using their securities upon the purchase, it will likewise be the duty of the court and the trustee at such time to make ample provision for the protection of all other bondholders, and particularly those who refuse to concur in any plan of reorganization, to secure to them their rights under the trust instrument—and if necessary to give full opportunity to all such to be heard as to the form and contents of the decree. In other words, if, at the time of entry of final decree, a claim may justly be asserted that, because of the situation existing among bondholders, provisions in the decree such as those recognizing the right of bidding bondholders to use their bonds to pay the price bid, might prejudice certain bondholders, the court might, and perhaps ought to, grant the contending bondholders the right to be heard. The trustee could not

take both sides. But until such situation arises, the apprehension of bondholders, unfortified by a fact, cannot admit them to the suit.

[4] There remains for consideration the question as to the criticisms made by the proposed interveners of the bill of complaint.

The lattter is conceded ample to obtain the relief to which the complainant is entitled by virtue of the trust deed upon the default in the payment of the bonds. It is suggested that, in case of a deficiency judgment, certain remedies might be invoked to recover for unpaid stock subscriptions, illegal dividends, and the like. A question is raised whether the good will of the defendant company should be included as property subject to the trust mortgage. With respect to the first of these, it need only be said that a trustee cannot be charged with a neglect of his duties merely because he has not framed his pleading so as to meet contingent situations which must be dealt with ordinarily through some supplemental remedies. There would be few cases of the character now before us, in which a bondholder would not be successful in intervening would he but take the trouble to suggest possibilities that might arise. No one can fairly say that the reclamation of dividends, the subjection of stockholders to liability on their subscriptions because of overvaluation of property, or that the ordinary features of creditors' bills are within the reasonable scope of a suit to foreclose a mortgage. With respect to the good will of the defendant, the allegations and prayer of the bill are broad enough for a decree directing foreclosure and sale of all the property covered by the trust deed; and, unless the terms or description of the deed are obscure or uncertain, the complainant is under no obligation to resort to any rule requiring greater particularity. So, too, the suggestions respecting the relief prayed for. It is said that the prayer is for strict foreclosure and also for a sale. By strict foreclosure, counsel doubtless had in mind the practice in state jurisdictions of foreclosing land contracts, the decree in such cases giving a short time for redemption, failing which absolute foreclosure is adjudged. In such cases a sale cannot be had. But the prayer in the present bill is ample to entitle the trustee to the ordinary relief obtainable in a suit to foreclose the trust deed in question.

It is a sufficient answer to the criticisms that they involve no showing of neglect; even if some of them were tenable, the bill comprehends what ordinary diligence and prudence dictates necessary and proper to be set out; and a failure specifically to embody incidental elements or suggestions of doubtful necessity or propriety does not justify a want of confidence in the complainant trustee.

[5] It is unnecessary to give extended consideration to the questions propounded by one of the interveners to the complainant. Some of them relate to matters, knowledge of which was within the equal reach of petitioners and the complainant; some of them assumed facts presumably not known to the trustee, and demanded whether if unknown it would ascertain knowledge; and what if any course it would pursue if or when it knew or ascertained the facts. Many of them, if required to be answered, might well call for serious and possible protracted consideration by eminent counsel. These questions,

18 in number, are mailed to complainant June 24th, doubtless coming to its hands on the following day. On June 27th is filed the petition for intervention, embodying a charge of neglect on the part of the trustee because it failed to answer these questions. It may fairly be asked whether more, or less, time was consumed by petitioners in preparation than was accorded to the complainant for their answer. Surely, with such haste, the proposed interveners cannot expect the court to construe the failure to answer, as an hostile act toward the beneficiaries; and it is not at all clear that a complainant trustee need at any time submit to such method of interrogation as was here attempted. The proposed interveners could not reasonably expect the complainant to answer affirmatively the question whether it "is consciously co-operating with the reorganization committee"; and the haste in filing the petition may have been prompted by the fear of receiving answers which would give no support to their intervention. Hence, support was sought in the charge that no answer was made. But most of the questions pertain to matters which are not to be asserted by bondholders through intervention—at least not in advance of the accomplishment by complainant of the primary purpose to foreclose the mortgage. Land Title & Trust Company v. Asphalt Company, 127 Fed. 1, 62 C. C. A. 23.

I am satisfied that the bondholders' petitions for leave to intervene are insufficient.

[6] In considering the petition of Eiseman as a stockholder, for leave to intervene, there is much force in the contention of the complainant that the petition should be accompanied by a proposed answer or other pleading disclosing the defense proposed to be asserted. A bondholder is in a sense a party. He does not appear of record because the rule of convenience which has been referred to excludes him; but he has an interest in the suit, the assertion and protection of which is committed to the trustee. A stockholder, however, is in no sense a party, and the effect of his intervention is to introduce a new party, or possibly to displace the corporation in which he holds stock; and there is good reason to require at the outset the tender of a pleading which as to form and substance will meet the requirements exacted of one regularly a party to the suit. But I have concluded to consider the petition to determine whether its substantive allegations are sufficient, either for intervention, or as a defense.

The criticisms which have been made respecting the insufficiency of the petitions for intervention by bondholders are equally applicable here. The mere assertion that a trustee is partial, or the characterization of a situation as fraudulent, collusive, and the like, is insufficient, in the absence of allegations of fact themselves giving rise to an inference of such partiality, fraud, or collusion.

It is elementary that Eiseman as a stockholder can have no personal or direct interest in the foreclosure suit. As a stockholder he has an interest in having the corporate rights asserted or protected; but, before he can be heard at all, he must be prepared to make a showing identical with that which would enable him, as a stockholder, to commence an independent suit to assert or protect a corporate right.

The mere fact that he is seeking to intervene in an existing suit to which the corporation has been made a party does not relieve him from the obligation to make the same showing. Assuming, therefore, that to establish his right to intervene he must meet the requirements of an ordinary bill by stockholders founded on rights which may properly be asserted by the corporation, the first requisite is that he disclose his efforts to secure such action as he desires on the part of the managing directors or trustees of the corporation, and the causes of his failure to obtain such action.

[7] In other words, the proposed intervener, claiming that the rights of the Allis-Chalmers Company are being sacrificed through unnecessary default, would, in a stockholders' bill, be required to show his efforts, if any, toward securing the necessary action on the part of the directors and trustee, either to prevent the default complained of, or to relieve from the necessary consequences ensuing therefrom. The intervener doubtless conceived that he brought his case within the well-known exception to the rule by the following allegation in his petition:

"That the said foreclosure proceedings are fraudulent and collusive and were instituted at the request of and in behalf of certain people who desire to reorganize the company for their own profit and to deprive bondholders and stockholders of their just dues; that the officers of the Allis-Chalmers Company, and particularly the president of the said company, are parties to this fraudulent and collusive scheme, and have fraudulently agreed that the said foreclosure proceedings should not be opposed by them, and have not attempted, although the funds are in their hands, to cure the default by paying the coupons on said first mortgage bonds, which were due and payable on the 1st day of January last past."

It being likewise elementary that the rule requiring a disclosure of a demand and the efforts made to secure action on the part of the corporation does not apply to situations where compliance therewith is unnecessary because useless, does the petition disclose this exceptional situation? Manifestly not. While the exception exists as stated, it is equally clear that the facts showing the case to come within the exception must be averred with the same clearness and explicitness as is required under the rule itself. The mere wholesale charge of fraud and collusion, the institution of a foreclosure suit at the request of "certain people who desire to reorganize the company for their own profit," "that the officers of the Allis-Chalmers Company, and particularly the president of the company, are parties to this fraudulent and collusive scheme, and have *fraudulently agreed* that the said foreclosure proceedings should not be opposed by them, and have not attempted, although funds are in their hands, to cure the default," do not satisfy the degree of particularity and definiteness required. Cook on Corporations, vol. 3, § 741. As indicated, the foreclosure proceeding, so far as concerns the complainant, was warranted by an actual default in the payment of a valid debt; and, before a stockholder can complain of the default suffered by the corporation defendant, he ought at least to say with particularity that the officers have failed or refused in a manner wholly inconsistent, not only with their corporate obligations, but clearly and explicitly inconsistent with corporate ability. The difficulty with the interven-

er's petition is that the facts alleged by him are fully consistent with the enforcement of complainant's rights under the trust deed, and he seeks to gain a standing solely through the characterizing of those facts as fraudulent and collusive; and the act of no officer of the corporation is pointed out, nor is there any particular designation of the acts of the board of directors disclosing fraudulent or collusive misconduct involving a sacrifice of corporate rights.

[8] What is last said brings us directly to the insufficiencies of the petition in averring the equivalent of a cause of action brought by a stockholder "founded upon rights which may be properly asserted by the corporation." It will not avail a stockholder, seeking to avoid a default suffered by a corporation, to allege merely that the corporation had cash and cash assets sufficient to pay the claim. The managing officers may, consistently with their duty, resolve not to pay it, and it is incumbent upon the stockholders to show that the refusal to so apply its assets cannot be reconciled with prudent and fair management; and this must be shown by facts of themselves disclosing the fraud or breach of duty, and not by allegations which embody nothing but the ultimate conclusion necessary to be established. Nothing appears in the petition, as it seems to me should appear, showing that if this default were cured the situation would then accord with the dictates of prudent corporate management; and that the funds alleged to be on hand are applicable, and of right should be applied, to the payment of the interest which has accrued and to nothing else. Naturally the managing officers of a corporation, though they may have funds sufficient to pay a debt, are vested with a discretion, and charged with a duty in determining whether the funds should be so applied—which discretion must be binding until abused.

The complainant's right to institute this suit under the authority granted by the trust deed, to be exercised upon default of the defendant in the payment of the debt secured, is not assailed. The actual existence of the default is not denied. Neither the defendant company, nor the herein defendant receivers in whose custody its property now rests, and who as officers of this court are charged with its protection, challenge the suit. If, in such situation, a stockholder is ever allowed to intervene and to frustrate the complainant trustee in further prosecution of the suit, he must disclose a situation so clear as to leave no fair doubt respecting the course to be pursued. In the present case it would mean a showing not only of assets sufficient to pay the debt, but also, that, because of fraud and collusion and their consequent injustice, the court cannot hesitate to direct the application of such assets toward the payment of the debt. Not only this, it must appear that, through such payment, the restored status will be such as to afford no just ground for complaint to the trustee, the bondholders, the defendant, or any other parties interested. In my judgment the Eiseman petition, giving it the most liberal construction, contains no allegations of fact which, if admitted to be true, lead to such conclusions. Land Title & Trust Co. v. Asphalt Co., supra.

An order may be entered sustaining the demurrer to the Eiseman and Timlin & Gold petitions.